UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 12-129 (RHK/FLN)

Chuck H. Crowell,

        Plaintiff,

        v.                           **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant

_____

James M. Doelle, Esq., for Plaintiff

David W. Fuller, Assistant United States Attorney, for Defendant

_____

        Plaintiff Chuck H. Crowell seeks judicial review of the final decision of the Commissioner

of Social Security ("Commissioner"), who found Plaintiff was not disabled from his alleged onset

date of June 16, 2004 through the date last insured of September 30, 2004. The matter was referred

to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28

U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C.

§ 405(g). The parties submitted cross-motions for summary judgment. [Doc. Nos. 10, 15.] For the

reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be

denied and Defendant's motion for summary judgment be granted.

## I.   INTRODUCTION

Plaintiff filed an application for disability insurance benefits on September 29, 2008, alleging a disability onset date of March 31, 2003, but subsequently amending the onset date to June 16, 2004. Tr 166-69, 35.)  His application was denied initially and upon reconsideration.  (Tr. 75-79, 82-84.) He requested a hearing before an ALJ, and the hearing was held on August 4, 2010.  (Tr. 85-86, 20-63.)  The ALJ denied Plaintiff's application for benefits on September 21, 2010.  (Tr. 7-19.)  The Appeals Council then denied Plaintiff's request for review.  (Tr. 1-4.)  Plaintiff filed a complaint for judicial review in this Court on January 17, 2012.   The matter is now before this Court on cross-motions for summary judgment.

## II.    STATEMENT OF FACTS

### A.    Employment History

Plaintiff was most recently employed as a van driver and GPS operator for Geospan from January 2000 through March 2003, when he was laid off.  (Tr. 224, 295.)  Prior to that, Plaintiff worked for five months in 1999 doing electronics assembly.  (Tr. 240, 295.)  Between 1994 and 1995, he worked as a telemarketer.  (Tr. 241, 295.)  Plaintiff was a machine operator at Metacom from 1991 until 1993.  (Tr. 677, 702.)  He left Metacom after sustaining a back injury.  (*Id.*)

### B.    Prior Medical Records

Plaintiff injured his back while lifting on August 24, 1992, resulting in a Worker's Compensation claim .  (Tr. 702.)  On March 18, 1993, Plaintiff underwent a left L5-S1 laminectomy, with removal of extruded disc herniation.  (Tr. 562-63.)  About five months later, Plaintiff had a second back surgery, L-4 laminectomy with left L3-4 lumbar discectomy and right L4-5 discectomy; hemilaminectomy at L5 on the left with epidural neurolysis and removal of recurrent herniated disc at L5-S1 on the left.  (Tr. 565-67.)  In November 1996, Dr. David Kraker performed Plaintiff's redo

left L5-S1 laminectomy, and discectomy and fusion at L3-4, L4-5, and L5-S1. (Tr. 569-72.) On February 15, 1998, Dr. Kraker removed the hardware from Plaintiff's fusion. (Tr. 574.)

Approximately five and a half years later, on September 9, 2003, Plaintiff went to the emergency room to get treatment for back and leg pain. (Tr. 361.) On examination, Plaintiff exhibited low back tenderness, muscle tightness, pain on leg raise tests, good flexion of his feet, hips and knees, but pain with hip flexion, decreased sensation in the right lateral thigh, 1+ deep tendon reflexes, pain with standing on the right or left leg, but his cranial nerves were intact. (*Id.*) Dr. Richard Rucker, Jr. diagnosed sciatica, prescribed Flexeril and Percocet, and recommended follow up with Dr. Kraker. (Tr. 362.)

Plaintiff saw Dr. Kraker three days later. (Tr. 576.) Dr. Kraker noted Plaintiff had done well after his last surgery and worked as a video surveyor until recently. (*Id.*) Plaintiff said he had progressive back pain in the low back the last few years, and significant right low back pain the last 2 ½ months, with numbness in the right foot and left leg pain. (*Id.*) On examination, Plaintiff walked with an antalgic gait; he was tender over the lumbar spine and sciatic notches; he had lumbar scoliosis, but intact strength and sensation in the lower extremities. (*Id.*) Dr. Kraker ordered a lumbar MRI and said Plaintiff "should remain off work at this time." (*Id.*)

Plaintiff did not have an MRI before he saw Dr. Kraker again on May 19, 2004. (Tr. 453.) Dr. Kraker noted Plaintiff was not working and could not be productive and perform a full day of work. (*Id.*) Plaintiff complained of pain in his back and legs, tingling in his toes, and numbness in his hands. (*Id.*) On examination, Tinel's sign was negative, there was mild tenderness and spasm in

the mid lumbar spine, lumbar range of motion was 5 flexion and 3-5 extension,[1] straight leg raise test

was positive on both sides at 60 degrees, and reflexes and motor strength were intact.  (*Id.*)  Dr. Kraker

again recommended an MRI, and that Plaintiff remain off work for two months.  (Tr. 453, 395.)

### C.    Medical Records From June 2004 through September 2004

On June 16, 2004, Dr. Kraker completed a "Report of Workability" form regarding Plaintiff.

(Tr. 394.)  Dr. Kraker opined that Plaintiff should be off work until June 21, 2004, then he would have

permanent restrictions of working 6-8 hours per day.  (*Id.*)  Dr. Kraker checked a box on the upper part

of the form indicating light duty, no frequent bending, lifting or twisting, and to stretch or change

position every 30 minutes.  (*Id.*) On the lower part of the form, Dr. Kraker opined that Plaintiff could

lift and carry five to ten pounds maximum, push and pull ten pounds maximum, he checked the box

"not at all" for bending and twisting/turning, and checked the box "fifteen minutes" for how frequently

Plaintiff should change position.  (*Id.*)

Dr. Kraker reviewed Plaintiff's June 9, 2004 MRI that day, noting Plaintiff had symptoms of

claudication,[2] advanced disc degeneration at L2-3 with retrolisthesis,[3] marked disc collapse with

---

[1] Normal lumbar spine flexion is 80 to 90 degrees; extension is 30 degrees; lateral flexion is 20 degrees, and rogation is 45 degrees.  Social Security Advisory Service, Range of Motion (ROM) Tests, available at http://www.ssas.com/disability-medical-tests/musculoskeletal/range-of-motion-test/

[2] Claudication refers to limping, usually intermittent. *Stedman's Medical Dictionary* ("*Stedman's*") 360 (27th ed. 2000).

[3] "Retrolisthesis (backwards slippage of one vertebral body on another) has historically been regarded as an incidental finding, one which doesn't cause any symptoms, and is considered to be of little or no clinical significance," although few studies have been done.  Michael Shen, M.D., Afshin Razi, M.D., Jon D. Lurie, M.D., M.S., Brett Hanscom, M.S., Jim Weinstein, D.O., M.S., "Retrolisthesis and Lumbar Disc Herniation: A Pre-Operative Assessment of Patient Function," Spine J. 2007; 7(4): 406-413 available at

narrowing, generally moderate central stenosis but severe at one level, pincer effect between the disc protrusion and posterior elements, disc bulging at T12-L1, and herniation at L2-3. (Tr. 452.) Dr. Kraker recommended an epidural injection at L2-3, and if his symptoms persisted, then Plaintiff would be a candidate for lumbar decompression at L2-3. (*Id.*) If the decompression resulted in instability, Plaintiff might need an L2-3 fusion. (*Id.*) Dr. Kraker also prescribed Flexeril. (*Id.*)

## D. Medical Records After the Date Last Insured

Plaintiff next saw Dr. Kraker on May 11, 2005. (Tr. 451.) He complained of progressive back and leg pain, and severe neck pain. (*Id.*) Plaintiff's lumbar epidural injection the previous July had not helped, and he wanted surgical correction. (*Id.*) Dr. Kraker recommended an MRI. (*Id.*) On May 25, 2005, Plaintiff's cervical MRI showed mild multi-level cervical spondylosis, including a tiny C6-7 disc protrusion, small T1-2 and T2-3 disc protrusions, and no neural compression. (Tr. 424.) Plaintiff's lumbar MRI showed severe degenerative changes and retrolisthesis at L2-3, endplate signal changes at L2-3 suggesting micro-instability; central canal stenosis was present; and a moderate sized L1-2 disc protrusion. (Tr. 425-26.) Based on Plaintiff's lumbar MRI, Dr. Kraker opined he was a candidate for bilateral laminectomy at L2-3, and right L1-2 laminectomy and discectomy. (Tr. 450.) He noted Plaintiff might require fusion across these levels in the future. (*Id.*) He would need approval from Worker's Compensation for the surgery. *(Id.)*

The surgery was scheduled for September 2005, but Dr. Kraker canceled it because Plaintiff had increased back pain, and there was a risk the planned surgery would destabilize the spine, and although helping the leg pain, it could cause increased back pain. (Tr. 449.) Three months later, to

---

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/

prevent the risk of instability, Plaintiff chose to have fusion as well as laminectomies. (Tr. 352-54.) Plaintiff continued to be evaluated and treated for back and leg pain through at least 2010, but the parties agree the medical records are generally not relevant because they are too far removed from the alleged disability period. However, the ALJ discounted Plaintiff's credibility in part based on a physical therapy progress note from January 2007, where Plaintiff's physical therapist noted, "Pt. has been remodeling his father's home during this time. Including demolition of bathroom tile for multiple days and weekends of hard labor." (Tr. 371, 16.) And, on April 4, 2007, Plaintiff's physical therapist noted that at Plaintiff's last visit, he said he was cleaning out his father's garage. (Tr. 369, 16.)

### E.    Administrative Hearing

Plaintiff testified to the following at the hearing on August 4, 2010. (Tr. 20-63.) He is a high school graduate. (Tr. 24.) He was laid off his job at Geospan in March 2003, but he was going to quit because his back was hurting again. (Tr. 30-31.) He believed it was in September 2003 that he first sought treatment for his back pain after being laid off. (Tr. 31-32.) He attributed the delay to the fact that Worker's Compensation did not respond to his phone call about paying for treatment. (Tr. 31-32.) Plaintiff received unemployment benefits after losing his job at Geospan. (*Id.*) When asked why he did not see Dr. Kraker between September 2003 and May 2004, Plaintiff thought he might have been waiting for approval from Worker's Compensation. (Tr. 32-33.) Plaintiff felt about the same in 2004 as he did at the time of the hearing, with a pain level from seven-and-a-half to eight out of ten. (Tr. 33.) He did not take narcotics regularly, but he took Flexeril and Percocet on and off after his injury. (Tr. 34-35.) Plaintiff was prescribed Flexeril for back pain in June 2004, his amended onset date. (Tr. 35.)

Beginning in June 2004, Plaintiff thought he could walk about a half-block to a block. (Tr. 37.) He could sit or stand for about fifteen minutes before needing to change position. (Tr. 37-38.) Plaintiff believed he could lift a "12-pack." (*Id.*) He did not feel he could work a sedentary job that allowed him to sit or stand as needed because he spent 90% of the day laying on the couch. (*Id.*) Plaintiff tried walking, as recommended by Dr. Kraker, after he was laid off by Geospan, but he ended up going home and laying down after walking a half-block. (Tr. 39.) He did not believe he took the full prescription of Flexeril that Dr. Kraker gave him in 2004 because it made him feel like a zombie. (Tr. 40.) He had an epidural injection in 2004, but epidural injections never helped him much. (Tr. 44.)

During the relevant time period, Plaintiff was able to drive short distances. (Tr. 42.) During the day, he watched television and surfed the Internet. (*Id.*) He did these activities reclining in a Lazy Boy chair. (Tr. 45.) He was capable of preparing easy meals for himself. (Tr. 43.) Twisting and bending at the waist greatly increased his pain. (Tr. 45-46.) He could independently shave but sometimes needed help showering and dressing. (Tr. 48.)

Plaintiff explained a note in the medical records from 2007 that said he was doing hard labor remodeling his father's house for several weekends. (Tr. 46-47.) He said he primarily watched the house while others worked, although he removed a few bathroom tiles. (*Id.*) He had a bedroom in the house and was able to lie down. (Tr. 47.) There was also an occasion in 2007 when Plaintiff cleaned his father's garage by throwing small items into a wheelbarrow, which his brother-in-law then wheeled out to his truck. (*Id.*)

Dr. Andrew Steiner testified at the hearing as a medical expert. (Tr. 50.) Dr. Steiner did not find evidence that Plaintiff met or equaled a listing for a spinal impairment during the relevant time

period.  (Tr. 53.)  He opined that Plaintiff would have the following work restrictions from June 16,

2004 through September 30, 2004: sedentary level of lifting and time on his feet, with occasional

bending, twisting, stooping, kneeling, crouching and crawling; walk one flight of stairs at a time; walk

one block at a time; sit/stand option (opportunity to change position) for a minute or two every hour.

(Tr. 53-54.)

Plaintiff's counsel asked Dr. Steiner if he disagreed with Dr. Kraker's June 16, 2004 work

restrictions, and Dr. Steiner said that he did.  (Tr. 54-55.)  Counsel asked Dr. Steiner how many times

Plaintiff had seen Dr. Kraker, and Dr. Steiner responded it was many times but he had not counted.

(Tr. 55.)  Counsel asked Dr. Steiner the time period in which Plaintiff had seen Dr. Kraker, and Dr.

Steiner said 2003, "or whatever the record showed."  (*Id.*)  The ALJ cut counsel off from this line of

questioning, noting she could count the number of times Plaintiff saw Dr. Kraker herself, especially

if restricted to the relevant time period because there was only one visit.  (*Id.*)  Counsel asked Dr.

Steiner if he had ever performed orthopedic surgery, and Dr. Steiner said he had not.  (Tr. 56.)  The

ALJ asked if counsel had anything further, and counsel said no.  (*Id.*)

J. Harren[4] testified at the hearing as a vocational expert.  (*Id.*)  Based on Plaintiff's testimony

about his job at Geospan, she found the job could be broken into two components, a driver and a

---

[4] The correct spelling of the vocational expert's name is found in the Vocational Consultant Case
Analysis.  (Tr. 302.)

surveillance system monitor.[5]  (Tr. 58-59.)  Plaintiff also described his work in 1999 as an electronics assembler,[6] and his past work as an inserter, a type of machine operator.[7]  (Tr. 57-59.)

The ALJ posed a hypothetical question about the type of work that could be performed by a 40-year-old high school graduate with Plaintiff's work history, and impairments of degenerative disc disease of the lumbar spine, with a history of two laminectomies, L3-S1 fusion, hardware removal, scoliosis, and disc herniation at L2-3.  (Tr. 59.)  The person would be restricted to sedentary work; lifting up to ten pounds occasionally; six hours of sitting; two hours walking or standing in an 8-hour day; no more than occasional bending, twisting, stooping, kneeling, crouching or crawling; walking only one flight of stairs or one block at a time; allowing a brief change of position hourly; and unskilled work only.  (*Id.*)  Harren testified such a person could perform Plaintiff's past relevant work as an electronics assembler and assembler/inserter.  (Tr. 60.)  There would also be other jobs such a person could perform in the national economy, including surveillance system monitor, with approximately 1,000 such jobs, and optical assembly, DOT 713.687-018, with approximately 6,000 such jobs.  (*Id.*)

The ALJ asked a second hypothetical question assuming a sedentary limitation where the person could lift five to ten pounds occasionally, push and pull ten pounds,

> but the work could not involve any bending and we're going to define bending as is defined in the DOT with bending forward at the waist and the legs, and in essence, it is going to preclude sitting down that definition, so are there light jobs that would not involve any bending,

---

[5] Surveillance System Monitor, Dictionary of Occupational Titles ("DOT") Code 379.367010, and Driver DOT Code 906.683-018

[6]  DOT Code 706.684-030.

[7] DOT Code 559.687-074.

any twisting or any turning?  Are there any sedentary jobs that would
not involve any bending?

(Tr. 61.)  Harren responded she did not believe so because the job would probably have to be

performed in a seated position.  (*Id.*)  Finally, the ALJ asked if a person could perform any of the

sedentary jobs identified by Harren, if the individual needed to work from a reclined position, like a

reclining chair with the feet elevated.  (*Id.*)  Harren said such a person could not perform the sedentary

jobs she identified.  (*Id.*)

### F.    ALJ's Decision

1.    The claimant last met the insured status requirements of the
Social Security Act on September 30, 2004.

2.    The claimant did not engage in substantial gainful activity
during the period from his amended onset date of June 16, 2004
through his date last insured of September 30, 2004.  (20 CFR
404.1571 *et seq.*)

3.    Through the date last insured, the claimant has the following
severe impairments: degenerative disc disease of the lumbar
spine and scoliosis; status post a history of laminectomies in
1993 and L3-S1 fusion in November 1996, hardware removal
in 1998, and further surgical procedures subsequent to the date
last insured (20 CFR 404.1520(c)).
. . .

4.    Through the date last insured, the claimant does not have an
impairment or combination of impairments that met or
medically equaled one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
404.1526).
. . .

5.    After careful consideration of the entire record, the undersigned
finds that, through the date last insured, the claimant had the
residual functional capacity to perform sedentary work as
defined in 20 CFR 404.1567(a) with lifting up to 10 pounds
occasionally; sitting six hours and standing or walking two
hours of an eight-hour day; no more than occasional bending,

twisting, stooping, kneeling, crouching, or crawling; walking should not involve more than one flight of stairs or walking more than one block at a time; the work should provide for a brief change of position hourly; and because of allegations of pain and side effects from medications, the work should be unskilled.
. . .

6.   Through the date last insured, the claimant was capable of performing past relevant work as a surveillance system monitor. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (20 CFR 404.1565).
. . .

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from June 16, 2004, the amended alleged onset date, through September 30, 2004, the date last insured (20 CFR 404.1520(g)).

(Tr. 12-19.)


## III.   CONCLUSIONS OF LAW

### A.   Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  In determining whether evidence is substantial, the court must consider

both evidence that supports and evidence that detracts from the Commissioner's decision. *Moore ex rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005).

**B.     Discussion**

Plaintiff raises four arguments in support of his motion for summary judgment. First, he contends the ALJ failed to properly weigh the medical opinions, and the treating doctor's opinion should have been given more weight. Second, Plaintiff argues the ALJ failed to fully and fairly develop the record by not allowing Plaintiff's counsel to fully question the medical expert at the hearing. Third, Plaintiff asserts the ALJ erred by discrediting Plaintiff for failing to seek treatment. Fourth, Plaintiff contends the RFC finding was improper because the ALJ did not rely on the treating physician's opinion. Thus, the VE testimony based on the RFC does not constitute substantial evidence in the record.

**1.     Development of the Record**

Plaintiff asserts the ALJ prevented his counsel at the administrative hearing from developing the record concerning Dr. Steiner's knowledge of the medical evidence. Plaintiff asserts he would have been able to show Dr. Steiner was not familiar with the medical evidence, thus calling his medical opinion into question because Dr. Steiner appeared to believe Plaintiff did not begin seeing Dr. Kraker until 2003, when he actually began seeing him in 1996. The Commissioner responds that Dr. Steiner demonstrated reasonable knowledge of the medical record in his testimony, and it is irrelevant if he could recall when Plaintiff began seeing Dr. Kraker or the exact number of times he

saw Dr. Kraker. The Commissioner notes the ALJ rightfully stated it was her responsibility, not the medical expert's, to weigh the medical opinions. Finally, the Commissioner notes the ALJ asked counsel if he had any more questions for the medical expert before moving on, and counsel did not.

The record shows that the ALJ stopped Plaintiff's counsel because the ALJ did not believe it was appropriate to question Dr. Steiner on factors the ALJ would use to weigh Dr. Kraker's opinion. Indeed, it is solely the ALJ's responsibility, if she does not grant controlling weight to the treating physician's opinion, to weigh the medical opinions under the factors in 20 C.F.R. § 404.1527(d), including the length and nature of the relationship between the claimant and the various medical sources. However, Plaintiff claims he was prevented from showing Dr. Steiner was not familiar with the medical records; therefore, his opinion should not have been credited. The record does not support Plaintiff's claim.

Although the ALJ prevented Dr. Steiner from answering how many times Plaintiff saw Dr. Kraker, Dr. Kraker responded it was many times but he had not counted. Before Dr. Steiner testified, the ALJ reminded him that the relevant time period was narrow, June 16, 2004 through September 30, 2004. As the ALJ noted, Dr. Kraker saw Plaintiff only one time during the relevant time period. Prior to questioning by Plaintiff's Counsel, Dr. Steiner demonstrated his knowledge of the medical record by describing all of the impairments he found in Plaintiff's medical records beginning with his 1992 injury and ending with Plaintiff's treatment in July 2004, as Plaintiff did not seek treatment again until May 2005, months after the date last insured.

Plaintiff's prior counsel demonstrated how it was difficult to respond to a very specific question about the medical records, despite familiarity with Plaintiff's condition, when the ALJ asked him if Plaintiff had an epidural in July 2004. Plaintiff's counsel said "[w]ell, I don't know. I would

have to go through the 91 page exhibits and other correspondence." (Tr. 52.) Similarly, the fact that Dr. Steiner could not respond to specific questions without looking back at the medical records does not indicate he was unfamiliar with Plaintiff's medical records. Finally, before Dr. Steiner's testimony concluded, the ALJ asked counsel if he had any more questions for Dr. Steiner, and he did not. The Court finds no error in the ALJ's attempt to preclude questioning of Dr. Steiner in the manner Plaintiff's counsel was pursuing. *See Sopelle ex rel. A.N.S. v. Astrue*, Civ. No. 09-3022 (PJS/JJK), 2010 WL 5113873 at *6 (D.Minn. Nov. 23, 2010) ("[i]n considering whether a case should be remanded because the ALJ did not fully develop the record, the reviewing court must consider whether the claimant was prejudiced or treated unfairly; absent unfairness or prejudice, the court will not remand" (citing *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993)).

### 2. Residual Functional Capacity

#### a. Medical Opinions

Plaintiff contends Dr. Kraker's opinion was entitled to substantial, if not controlling weight, because he had a fourteen-year treating relationship with Plaintiff' beginning in 1996, encompassing at least 31 visits. Prior to 2004, he performed two back surgeries on Plaintiff. The ALJ rejected Dr. Kraker's June 16, 2004 RFC opinion for three reasons. First, the ALJ found Dr. Kraker's opinion consistent with Dr. Steiner's opinion, with the exception of Plaintiff's need to change position every fifteen minutes, and that he could never bend, twist or turn. (Tr. 16.) The ALJ did not give any weight to those portions of Dr. Kraker's opinion because the form Dr. Kraker completed contained inconsistencies in Plaintiff's ability to bend, twist, turn, and the frequency of his need to change position. (Tr. 16-17.) Also, it was unclear what definition Dr. Kraker used for bending. (Tr. 17.) The SSA's definition includes bending the body downward and forward, an activity that is involved in

sitting. (*Id.*) Dr. Kraker indicated Plaintiff could sit every fifteen minutes, and the ALJ noted Plaintiff had to bend every time he got into a car. (*Id.*)

Second, the ALJ discounted Dr. Kraker's opinion because he saw Plaintiff infrequently during the relevant time period, and only treated him with one prescription of Flexeril and one injection. (Tr. 17.) The ALJ also discounted Dr. Kraker's July 2010 statement that, to the best of his knowledge, Plaintiff had been unable to return to work since September 12, 2003. (Tr. 18.) This statement was discounted because it was made so long after the date last insured. (*Id.*) The ALJ also noted the independent medical examiner, Dr. Paul Wicklund, gave an RFC opinion in September 2008 that was generally consistent with Dr. Steiner's opinion. (*Id.*)

Plaintiff asserts Dr. Kraker's June 2004 opinion on a Report of Workability was not inconsistent, because the restrictions on the lower part of the form were specific restrictions, which Dr. Kraker used to further explain the "light duty" box on the upper part of the form. Plaintiff points out that the upper part of the form offered only two options, light duty or moderate duty,[8] which is why Dr. Kraker had to explain his opinion for less than light duty below. The Commissioner contends Dr. Kraker did not have to check any box on the upper part of the form, and on many other occasions, he left the upper part blank. The Commissioner also notes Dr. Kraker did not write in any sitting, standing or walking limitations.

Plaintiff argues it was wrong for the ALJ to equate bending with sitting, and then find that a person with a multi-level lumbar fusion could bend for six-hours per day [the definition of occasional during an eight-hour day]. Plaintiff further argues the state agency consultants' opinions were not entitled to the weight accorded by the ALJ because they never examined Plaintiff and did not review

---

[8] Moderate duty was defined as "no frequent, bending, lifting or twisting. Stretch/change position every hour." (Tr. 394.)

the entire record. The Commissioner asserts the ALJ did not equate bending with sitting but noted that bending is a required step in sitting, and Dr. Kraker opined Plaintiff should change between standing and sitting every fifteen minutes.

An ALJ should give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions: 1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

In fact, the ALJ did not accord any specific weight to the state agency physicians' opinions. The ALJ noted only that the state agency physicians' opinions were consistent with Dr. Steiner's opinion, which he gave the greatest weight. While it is true that Dr. Steiner did not have a treating or examining relationship with Plaintiff, Dr. Kraker's opinion was not entitled to any weight because it was internally inconsistent. Plaintiff may be correct that Dr. Kraker intended to describe Plaintiff's specific restrictions on the lower part of the Report of Workability form, and the upper part was less important because it only reflected a choice between light duty and moderate duty. However, the ALJ

was correct that the upper and lower parts of the form were literally inconsistent, with restrictions of *no frequent* bending, lifting or twisting on the upper part of the form, and *no* bending, twisting or turning *at all* on the lower part of the form*;* and change of position every thirty minutes on the upper part of the form, and every fifteen minutes on the lower part of the form. (Tr. 394.) An ALJ can discount a treating physician's inconsistent opinions, and it was reasonable for the ALJ to do so here. *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (ALJ properly discounted treating physician's inconsistent opinions that were based on the very same information).

Additionally, it was reasonable for the ALJ to conclude that a restriction of never bending, twisting or turning is inconsistent with the need to change position between sitting and standing every fifteen or thirty minutes. Dr. Kraker did not offer narrow definitions of bending, twisting or turning that would explain how a person who could never perform these actions would need to frequently change posture. In Plaintiff's one visit with Dr. Kraker during the relevant time period, Dr. Kraker reviewed Plaintiff's lumbar MRI and opined that if an epidural injection did not resolve his symptoms, he might be a candidate for back surgery. He said nothing about the physical structure of Plaintiff's spine precluding him from bending, twisting or turning. The objective record does not support a limitation so extreme as to preclude ever bending, twisting or turning. Plaintiff's objective impairments of scoliosis and history of back surgeries in 1993-1998 did not preclude him from working in 1999, and in 2000 until he was laid off in March 2003, suggesting these impairments did not preclude bending, twisting or turning.

Plaintiff's testimony that he spent 90% of the day laying on a couch or in a recliner is inconsistent with Dr. Kraker's requirement that Plaintiff change position every fifteen or thirty minutes. Furthermore, Dr. Kraker's unexplained statement that Plaintiff should not work offers little in support of his RFC opinion, except to suggest Dr. Kraker relied on Plaintiff's subjective complaints

regarding his pain and limitations. *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ( "'[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements'") (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)).  As discussed below, when the credibility factors are considered, the ALJ properly discounted Plaintiff's subjective complaints and Dr. Kraker's opinion.

**b.    Credibility**

Plaintiff asserts the ALJ erred by discounting his credibility for lack of treatment during the relevant time period.  First, although Dr. Kraker did not recommend any treatment when he saw Plaintiff on May 19, 2004, Plaintiff notes the ALJ did not mention that Dr. Kraker had earlier recommended that he should not work.  (Tr. 576.)  Second, although Plaintiff only received one epidural injection between his visits with Dr. Kraker in June 2004 and May 2005, Plaintiff notes the ALJ failed to acknowledge that Plaintiff was reluctant to have epidural injections because they had not helped in the past.  (Tr. 451.)  Plaintiff further asserts that epidural injections, which have a short-term effect, do not affect his scoliosis, a structural spine problem.

Third, Plaintiff contends that his attempt to get Worker's Compensation to pay for his treatments and waiting for approval is not inconsistent with his allegation of disabling pain.  Plaintiff cites many instances after his date last insured when Worker's Compensation delayed or denied approval for treatment.  Social Security Ruling 96-7p cautions the ALJ against drawing inferences from failure to pursue regular medical treatment without considering whether evidence in the record explains the infrequent medical visits.

The Commissioner responds that Plaintiff's infrequent and conservative treatment during the relevant time frame undermines Dr. Kraker's May 2004 conclusory opinion that Plaintiff should not work.  Moreover, the evidence does not support Plaintiff's supposition that he did not have further

18

treatment because Worker's Compensation did not approve it. The Commissioner also contends it was reasonable for the ALJ, in the credibility analysis, to consider activities Plaintiff performed in 2007, because Plaintiff testified his condition was the same in 2004 as it was later.

Here, although Plaintiff's explanation is plausible, the record could support the ALJ's conclusion that Plaintiff did not seek treatment or evaluation between June 16, 2004 and May 2005 because his pain was not as severe as he alleged. The treatment that Plaintiff received in the relevant time period was one epidural injection and one prescription for a muscle relaxant, which Plaintiff testified he did not finish. This level of treatment was inconsistent with disabling pain and severe functional limitations. *See Wagner v. Astrue*, 499 F.3d 842, 853 (8th Cir. 2007) (ALJ properly found claimant not credible where claimant received minimal medical treatment and did not take pain medication). Even if epidural injections never helped much in the past and Flexeril caused side effects, Plaintiff did not seek alternative treatment, not even a different pain medication, for at least ten months. Although there is evidence in the record of Plaintiff having difficulty getting treatment approved by Worker's Compensation at other times, there is nothing in the record to support Plaintiff's testimony that this is why he did not have treatment in the relevant time period. Plaintiff went to the ER for treatment in September 2003, and could have done so again without approval from Worker's Compensation. Under these circumstances, the court should affirm the ALJ. *See Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("if, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.)

Although the medical evaluations and treatments Plaintiff received in 2007 are generally not relevant to whether he was disabled between June and September 2004, Plaintiff testified that his condition was pretty much the same at the time of the hearing as it was in 2004. (Tr. 33.) Thus, it was

not error for the ALJ, as one factor, to discount Plaintiff's subjective complaints because he spent several weekends in January 2007 remodeling his father's house, and time cleaning his father's garage in April 2007. Plaintiff's accounts of these activities at the hearing were different from how they were described in his physical therapist's notes, and the ALJ was not required to accept Plaintiff's explanation that he in fact did very little. Overall, the ALJ gave good reasons for discounting Plaintiff's subjective complaints of pain and limitations. Thus, he adopted Dr. Steiner's sedentary RFC opinion, with lesser bending, twisting and turning restrictions and less frequent need to change positions, over Dr. Kraker's opinion of greater restrictions. Therefore, the court should affirm the ALJ's RFC determination.

### 3. Hypothetical Question to the Vocational Expert

The ALJ relied on the VE's response to a hypothetical question that assumed Plaintiff had the impairments and restrictions that the ALJ found supported by the record. Because the Court finds the ALJ's RFC finding is supported by substantial evidence in the record as a whole, the ALJ did not err in relying on the VE's testimony of Plaintiff's ability to perform work as a surveillance system monitor. *See Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (ALJ properly relied on VE's testimony based on a hypothetical question that contained all impairments supported by the record.) Therefore, the Court recommends affirming the ALJ's decision.

### IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment (#10) **be denied.**

2. Defendant's Motion for Summary Judgment (#15) **be granted;**

4.      The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED: February 13, 2013

                    *s/ Franklin L. Noel*
                    FRANKLIN L. NOEL
                    Unites States Magistrate Judge


        Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 28, 2013**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.